## KINNEY v. LIBBEY.

(Supreme Court, Appellate Term.   June 6, 1907.)

LANDLORD AND TENANT—EVICTION—INJURY TO PREMISES.

    The tearing down, excavation, and reconstruction of a building by the landlord next to the hotel leased by the tenant caused the wall of the hotel on that side to become cracked and unsafe, and some of the rooms on that side were rendered unfit for use for a time.  The furniture, however, was not moved, and the tenant paid the rent for a part of the time after they were in this condition, and used them after the repair of the wall.  The tenant remained in possession of the premises and continued to use them.  The repairs at no time rendered the building impossible of occupation.  *Held*, that there was not an eviction.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, § 711.]

Appeal from Municipal Court, Borough of Manhattan, Sixth District.

Action by Frank S. Kinney against Octavius B. Libbey.   From a judgment for plaintiff, defendant appealed.   Affirmed.

Argued before GILDERSLEEVE, P. J., and FITZGERALD and GOFF, JJ.

Albert Francis Hagar, for appellant.

Turner, Rolston & Horan (James F. Horan and Edward H. Blanc, of counsel), for respondent.

GOFF, J.   For convenience of expression the parties to this appeal will be designated, respectively, as "landlord" and "tenant."   As lessor the landlord executed to the tenant as lessee a lease of the premises known as the "Albemarle Hotel" for a period of five years at an annual reserved rental to be paid monthly in advance, and under this lease the tenant entered into possession.   Nearly two years after the commencement of the tenancy the landlord became the owner of the buildings adjoining the Albemarle Hotel on the north and west, and known as the "Hoffman House."   In June, 1906, the landlord made a contract with the Thompson-Starrett Company to demolish the old buildings of the Hoffman House and erect on the site a new structure to be called the "New Hoffman House."   The contractor commenced the demolition in preparation for the new structure, and it was because of certain alleged consequences of the performance of that work that the present controversy arose.   On November 20, 1906, the landlord instituted summary proceedings to recover possession of the Albemarle Hotel, by presenting a petition to the Municipal Court which set forth that the tenant, though demand had been made, had refused to pay the monthly rent due in advance for the months of October and November, and also the taxes, which under the lease were included as rent.   The tenant by answer denied that he was in possession of the whole of the premises and that the rent was due, but averred that the landlord violated the covenant in the lease for quiet possession and enjoyment by a wrongful eviction, for which damages were claimed by way of counterclaim.   The issues thus joined were tried before the justice without a jury, and at the close of the case he made a final

order "that the allegations of the petition are true, that no valid defense or counterclaim has been proven, that the tenant has failed to pay the rent," and that after default in the payment of rent he held over and continued in possession of the premises without the permission of the landlord. In pursuance of this order a warrant was issued, and under it the tenant was ousted.

On the trial the tenant admitted the relation of landlord and tenant, that the rent and taxes were due and unpaid, that demand had been made, and that the tenant remained in possession. This left a single question of fact to be determined by the justice: Did the evidence support a finding that the acts complained of constituted an eviction? And on this question the tenant assumed the burden of proof. He in substance testified that, though the tearing down of the old adjoining buildings caused much discomfort from noise, vibration, and dust, he had no cause of complaint prior to September, for which month he had paid the rent. The excavation on the west side went below the foundation of the Albemarle, which caused the westerly wall of the hotel to crack. This wall, after a survey by the building department, was condemned as unsafe, and certain measures for its safety were prescribed. These measures consisting in shoring up the wall and underpinning the foundation, so that a cement foundation could be underlaid the wall to rock bottom. As a consequence the walls and partitions showed cracks in 15 or 16 rooms in the west suite of the hotel, so that some of them could not be used. Owing to their condition and to the noise of hammering, etc., guests left and went to other hotels. The furniture was not removed from these rooms. He continued in possession and occupation of the hotel, and was "running" it as such, and since October 1st he had guests in the rooms where the cracks were. On the north side a wall surrounding a court on the second story was removed, but no complaint can arise from that, because he consented to its removal on condition that a wooden wall covered with tin should replace it; but even though that condition had not been complied with, yet the consent to the removal of the brick wall made it a lawful entry for that purpose. There are omitted some things that occurred before September, for the reason that on his own statement he had no fault to find before that time. Mr. McKim, an expert called by the tenant, said that the westerly wall of the hotel—where the adjoining building had been torn down—was 12 inches thick, lined with rather poor mortar; that the soil under the masonry was very poor clay, mixed with mica and fine sand and saturated with water, in which the clay could be dissolved. Mr. Simpson, foreman for the contractor, said that this was an old wall, that cracks had been discovered in it before the foundation had been touched, and that these cracks were caused by the removal of the adjoining wall. If this were so, these cracks were latent defects, which under a clause in the lease the landlord was not to be held responsible for, and, further on that point, the tenant knew when he paid the September rent that the cracks in the walls and the rooms and the break in the kitchen wall and chimney existed. The landlord, by his witnesses, gave testimony that, as soon as notice from the building department was received as to the unsafe condition of the westerly

wall, immediate steps were taken to strengthen it, and in doing so approved methods in construction were adopted. Further testimony was given that the cracks in the walls were slight, that the things complained of by the tenant were exaggerated, and that the work was carried on in a manner to cause the least possible annoyance.

The testimony was very voluminous, and only a very brief reference to it has been given, in order that, apart from any conflict, the question may be asked: Has the tenant, under the most favorable construction of his testimony, established by a preponderance of evidence that he was evicted? Except for the entrance of the workmen to put plaster on the cracks, and in relation to the boiler chimney and to the underpinning of the foundation, there is no evidence of any physical encroachment by the landlord. Nor is there evidence that the tenant was deprived of free access to and from all the rooms and parts of the hotel, nor that his furniture or fixtures or appurtenances were disarranged or interfered with; but there is his own evidence that he continued to occupy and use the building for hotel purposes. The complaint of the tenant is narrowed down to this: That there were 15 or 16 rooms in which the walls were cracked and which guests refused to occupy, and yet guests occupied these rooms after October 1st. Whether their refusal was based upon the cracks in the walls, the noise, the dust, or the vibration, or upon all combined, must be left largely to conjecture. At all events it is clearly proven by the tenant's own evidence that he remained in possession and exercised full control over all parts of the hotel. It is a rule of law clearly established in this state that there cannot be an eviction without abandonment; in other words, that the tenant cannot hold the premises and refuse to pay rent. In Boreel v. Lawton, 90 N. Y. 293, 43 Am. Rep. 170, Andrews, C. J., said:

"We know of no case sustaining the doctrine that there can be a constructive eviction without a surrender of possession. It would be manifestly unjust to permit a tenant to remain in possession, and, when sued for the rent, to sustain the plea of eviction by proof that there were circumstances which would have justified him in leaving the premises."

Even where there is no actual entry or physical disturbance, but circumstances may justify the tenant in abandoning the premises, yet the circumstances must be taken in connection with the abandonment to justify plea of eviction. Dyett v. Pendleton, 8 Cow. 728. There can be no eviction if the tenant continues in possession of the whole, however much he may be disturbed in the beneficial enjoyment. It must amount to a deprivation of possession, the possession must be given up by the tenant in consequence of the acts of the landlord, and the acts must be such as to warrant and justify the tenant in so doing. The possession must be out of the tenant and in the landlord. Edgerton v. Page, 20 N. Y. 281; Thompson v. Durant, 144 N. Y. 34, 39 N. E. 7; Mead v. Stackpole, 40 Hun, 473; Douglas v. Cheesebrough, 56 App. Div. 403, 67 N. Y. Supp. 755; Olson v. Schevlovitz, 91 App. Div. 405, 86 N. Y. Supp. 834; Ernst v. Straus, 114 App. Div. 19, 99 N. Y. Supp. 597. The same principle is maintained in Waite v. O'Neil, 76 Fed. 408, 22 C. C. A. 248, 34 L. R. A. 550, and Skally v. Shute, 132 Mass. 367.

In Tallman v. Murphy, 120 N. Y. 345, 24 N. E. 716, it was also held that, if the landlord commits or suffers acts to be done which make it necessary for the tenant to remove, this is equivalent to expulsion. In the case at bar it did not appear that acts were done which made it necessary for the tenant to remove, and the fact that he did not remove is conclusive that it did not become necessary to do so. In Johnson v. Oppenheim, 55 N. Y. 280, it was held that the building on the adjoining lot, by which the premises of defendant were rendered less commodious or less suitable to his uses, did not affect the right of the plaintiffs to their rent, or authorize the defendants to abandon the premises. Snow v. Pulitzer, 142 N. Y. 263, 36 N. E. 1059, was a case in which the tenant sued for damages on account of the wall of his premises falling when the wall of the adjoining premises was torn down by the landlord. The landlord owned both houses at the time of the lease, and it was held that the landlord could not deprive the tenant of the lateral support of his own walls; but the points of difference between that case and the case at bar are that that was an action for damages, and this was a defense of eviction. There the landlord owned the adjoining premises at the time of the lease, and here he did not. Carter v. Bryon, 49 Hun, 299, 1 N. Y. Supp. 905, was a question on the consent of tenant for landlord to fence off 17 feet of demised lot; and Sirey v. Braems, 65 App. Div. 472, 72 N. Y. Supp. 1044, was whether certain land was included in the lease, and, if it were, an eviction therefrom was undisputed. Neither of these cases are applicable.

Special reliance is placed on Hamilton v. Graybill, 19 Misc. Rep. 521, 43 N. Y. Supp. 1079, and Hall v. Irvin, 78 App. Div. 107, 79 N. Y. Supp. 614. In the former case the landlord partitioned off a hall from which there was an entrance to the tenant's office, thereby depriving him of the means of access to his office, and it was held that was a permanent deprivation; while in the latter case the landlord for a time deprived the tenant of the use of halls, entrances, closets, and other necessary appurtenances to his offices, and it was held that that amounted to an eviction.

We are constrained to hold that the tenant failed to prove acts that constituted an eviction as a defense for his refusal to pay his rent.

The final order should be affirmed, with costs. All concur.